J. K. DARLING, ADMR. OF S. B. HEBARD'S ESTATE *v.* C. S. EMERY, ADMR. OF PAULINE A. CABOT'S ESTATE, ALBERT A NILES, ET AL. AND FRANCES MAGOON, ET AL.

October Term, 1901.

Present: TAFT, C. J., ROWELL, TYLER, MUNSON and STAFFORD, JJ.

Opinion filed March 8, 1902.

*Gift in apprehension of death—Findings of special master.*

A finding by a special master that the decedent summoned a lawyer to assist in arranging her business affairs and not to make her will, based upon the testimony of her attendant to that effect, is justified, though the decedent's aged husband testifies that she called the lawyer to make the will.

Evidence to the effect that decedent, at the time of making the alleged *donatio mortis causa*, seemed to be rapidly failing, appeared to be much discouraged, and talked as if she did not expect to recover, and that she did continue to fail without improvement until her death, is sufficient to support a finding by a special master that she was conscious of her condition and did not expect to recover.

The finding by a special master of facts sufficient to constitute a valid gift *causa mortis*, is justified, though it appears that as a part of the same transaction the decedent executed a defective will disposing of the property in the same way.

APPEAL in Chancery. Heard on a master's report and defendant Emery's exceptions thereto at the December Term, 1900, Orange County, *Watson*, Chancellor, presiding. Exceptions overruled and decree sustaining the gift in question. The defendant Emery appealed.

*Geo. L. Stowe* and *Geo. M. Powers* for the appellant.

A careful examination of the testimony will show that the finding of the master as to the gift are unsupported except by *evidence received under objection*.

The testimony of Albert and Chester Niles was inadmissible. The relation of the defendants to each other in a bill of interpleader is the same as if one had brought a bill against the other, predicated upon the same matter and for the same purpose. *Horton* v. *Society,* 34 Vt. 309. Therefore these two witnesses, standing as parties defendant to an action brought by an administrator, are incompetent and the receipt of their testimony was error. V. S. 1237, 1238.

The testimony of Albert Niles relative to the conversation with Hyde Cabot since the appointment of the administrator, was inadmissible. It was offered for two purposes: To impeach Cabot, and to show his understanding relative to the delivery of the bonds. It was not admissible on the first ground, because no foundation had been laid. It was not admissible on the second ground, because Cabot's understanding about the delivery was entirely immaterial.

Even if enough had been done to effect a valid gift *causa mortis,* it was revoked by the execution of the will. The gift was then and there abandoned and a new plan adopted. That the will failed is immaterial. It shows an intention to revoke the gift if one had been made.

*Hale K. Darling* and *Dillingham, Huse & Howland* for the appellees.

The findings objected to by the appellant are supported by the testimony of Mary E. Walker, p. 5, line 5, Dr. Frost, p. 4, line 20, Edith S. Dearborn, p. 10, line 8.

Fraud not being claimed, the findings must stand unless it affirmatively appears that they were made without evidence. *Herrick* v. *McCawley,* 72 Vt. 240, and numerous other cases in this state.

The testimony of Mrs. Walker as to Mrs. Cabot's idea of her physical condition was strictly relevant. 14 Am. & Eng. Enc. (2d Ed) 1055.

The testimony of Albert Niles was proper impeachment. It is not necessary for a witness to absolutely deny a certain statement before impeaching testimony can be introduced; it is enough if the witness states he does not recollect it. *Holbrook* v. *Holbrook,* 30 Vt. 432; *Crowley* v. *Page,* 7 C. & P. 789; *Chapman* v. *Chapman,* 14 Gray 454.

A gift *causa mortis* having been effected, the execution of the will did not revoke it. *Jones* v. *Silsby,* Prec. Chan. 300; *Emery* v. *Clough,* 63 N. H. 552; *Nicholas* v. *Adams,* 2 Whart. (Pa.) 17; *Brunson* v. *Henry,* 140 Ind. 455; *Hoen* v. *Struttman,* 71 Mo. App. 399.

STAFFORD, J. The controversy is over four bonds that once belonged to Pauline Cabot, who lived in Chelsea, Vt., and died there in February, 1894. Her administrator, Mr. Emery, claims them all as part of her estate. On the other hand, two of them are claimed by the Niles children, and the other two by the Haskins children, as gifts made to them by Mrs. Cabot in apprehension of death. During her last illness she had placed them in the hands of Mr. Hebard, a lawyer in Chelsea, who also died a few months after Mrs. Cabot, leaving the bonds among his papers. Mr. Darling became his administra-tor, and, in view of these different claims, brought a bill of interpleader against Mr. Emery as administrator of Mrs.

Cabot, the Niles children, and the Haskins children, and paid the bonds into court.    He was accordingly dismissed with his costs; which have been paid out of the fund.    The defendants were ordered to interplead, and have done so; a master has reported the facts; the court of chancery has made its decree thereon upholding the gifts, and from that decree Mr. Emery, the administrator, has appealed.

The story to be gathered from the report is this: Mrs. Cabot's maiden name was Pauline Jones.    She had a sister, a Mrs. Haskins, who died in 1872, leaving five daughters, the youngest a babe, and the oldest only fourteen years of age.    The circumstances of the father were such that she took two of the girls home and supported them,—one until the child's death, and the other until the child's marriage,—and took a deep, motherly interest in them all.    Four of these nieces survive and are the defendants Frances Magoon and others, referred to as the "Haskins children."    In 1884, Pauline married Mr. Niles.    He then had three children of a former marriage, and these are the defendants Albert Niles and others, referred to as the "Niles children."    He died within forty-eight hours after their marriage, leaving an estate of more than $9,000 for distribution to his widow and children.    Pauline, with a full understanding of her rights, accepted one thousand dollars in full of her share, and with it purchased the two five hundred dollar bonds involved in this suit, which she always treated as the one thousand dollars from the Niles estate.    She remained friendly to the Niles children to her death.    In 1888 she married Mr. Cabot, and lived with him as his wife till she died.    Before their marriage they entered into a written contract whereby each renounced all interest in the other's estate.

In August, 1893, Pauline was taken sick, and failed in health continually until her death.    By the 7th of November she had become so ill that three physicians were called in con-

sultation. After this she seemed very much discouraged. On November 9th, she had in her possession the two five hundred dollar bonds, and another for four hundred and fifty dollars, and still another for three hundred and seventy-five dollars. In the morning she told her husband that her business was not arranged as she desired, and asked him to call in Mr. Hebard to assist her in arranging her business affairs. Mr. Cabot went for him, and he came immediately to her room. She took the bonds in her hands, and told him she wanted the two five hundred dollar bonds to be paid back to the three Niles children; that this one thousand dollars came from Mr. Niles, and she wanted it to go back into his family; and that she wanted the other two bonds to go to these nieces, the four Haskins children, naming them; and she then and there delivered the four bonds to Mr. Hebard, who took them and kept them thereafter. At this time Pauline was so sick, and so conscious of her condition, that she did not expect to recover, but did expect to die of that illness, and, so believing, she desired to give the two five hundred dollar bonds, in equal parts, to the three Niles children, and the other two, in equal parts, to the four nieces, and, to that end, delivered the bonds to Mr. Hebard, that he might and should deliver them, as before stated, after her death, to be held by the donees, respectively, in such equal parts; and Mr. Hebard then and there accepted and received them for that purpose.

After Pauline had delivered the bonds to Mr. Hebard, as just related, and before the latter left the room, he suggested to her, "This better be in a will." Up to this time, nothing had been said about a will in that interview. She replied, "If you think that the best way, I will make a will." He replied, "I think that is the better way, and I will write it out and have it executed." He went away and drew up a will disposing of the bonds in the same manner, and naming himself as execu-

tor, and came back with it the next day and read it to her. She was satisfied with it, and executed it. She was never any better, but grew worse, and died February 4, 1894. Mr. Hebard died November 17, 1894. One of the witnesses to the will was Mr. Cabot, the testatrix' husband, so that the instrument was disallowed in the Probate Court and in the County Court; and that judgment was affirmed here. *Smith* v. *Jones,* 68 Vt. 132, 34 Atl. 424.

The master says he has found all these facts either from concessions and agreements of all the counsel or from evidence that came in without objection. But the administrator disputes this, and says that there was no evidence, received without objection, from which he could have found any of the following facts:

1. That she told her husband her business was not arranged as she desired, and requested him to call in Mr. Hebard to assist her in arranging her business affairs.

2. That she was conscious of her condition, and did not expect to recover, but did expect to die of that illness.

3. That she desired to give the bonds to the Niles children and the Haskins children as above set forth.

4. That she delivered the bonds to Mr. Hebard for the purpose above set forth.

5. That Mr. Hebard accepted and received the bonds for that purpose.

6. That in the interview between her and Mr. Hebard nothing had been said about a will until Mr. Hebard suggested it.

1. As to the first point. Mr. Cabot and Mrs. Walker were the only witnesses upon this subject. Mrs. Walker was taking care of Mrs. Cabot. Referring to the morning of November 9th, she testified: "When I went in from breakfast, Mr. Cabot spoke to me. He went out as soon as I came in.

She (Mrs. Cabot) said her business was not arranged as she wanted, and wanted Mr. Hebard to come and arrange them for her. She asked me to get her papers, and get ready for Mr. Hebard. I got four bonds where she told me,—from a drawer * * * . When Mr. Hebard came in she told him what she had sent for him for,—to arrange her business." She then testified to the interview between Mr. Hebard and Mrs. Cabot as the master has reported it; saying that nothing was said about a will until just as Mr. Hebard started to go away, with the business apparently done, when he made the suggestion. Mr. Cabot, on the other hand, testified thus: "She said, 'I want you to go down and have Hebard come up here.' I asked her what she wanted of Mr. Hebard. She said she wanted to make a will." And when Mr. Hebard came, "Mr. Hebard asked what she wanted. She said she wanted to make a will." There were several points of difference between Mr. Cabot's testimony and Mrs. Walker's; and, although they seem to agree that Mr. and Mrs. Cabot were alone together when she asked him to go for Mr. Hebard, it was, in the circumstances, open for the master to find whether she asked him to get Mr. Hebard to arrange her affairs or to make her will. In view of Mr. Cabot's great age, and what the master might consider his failure of memory in other particulars, he might discard the witness' testimony entirely upon that point, and, leaving that out, find that she sent for Mr. Hebard for the purpose she had just before stated to Mrs. Walker, and just afterwards stated to Mr. Hebard. The course of the Hebard interview itself as narrated by Mrs. Walker, tends to show that she did not tell her husband what he says, but did tell him what the master finds.

2. There was evidence to support this finding in the testimony of Mrs. Walker: "She seemed to be failing very rapidly. I think she thought she would not live but a short time.

At the time of making the will she talked as if she did not expect to get well, and wanted to arrange her property." Referring to the same time, Edith Dearborn testified: "She seemed very much discouraged. She was failing." Dr. Goss said: "She failed from November 7th till she died. Same ailment continued from early fall, and caused her death. No recovery; no improvement from beginning."

3, 4, 5 and 6. These findings are all sustained by the testimony of Mrs. Walker as quoted in the printed case, pp. 17-20. Indeed, we do not see how the contrary can be seriously claimed, except upon the ground which we are to consider next, namely, that what was said and done about the will must have the effect to neutralize what had been said and done towards making a gift of the bonds in apprehension of death. This claim has a double aspect,—one in fact, and one in law.

It is claimed that, as matter of fact, the whole transaction touching the bonds amounted to an attempt to dispose of them by will and not in the way of *donatio mortis causa,* and so clearly and unquestionably so that the master was not justified in finding as he has. But we cannot say that the two things are inconsistent in fact. We do not see why Mrs. Cabot may not have wished to give these bonds in just this way, and to perfect the gift by a delivery such as she made, and why she may not have done so, and then, after that was all completed, have acquiesced in her attorney's suggestion to make a will, as a further means of securing the fulfillment of her intention. If the question be treated as one of fact, purely, it was for the master to say whether, in trying to make a will, she meant to take back what she had given or to change the substance of anything she had done; and he has not made any such finding.

Neither do we think the two things are inconsistent in law. We agree with counsel for the estate that the whole in-

terview is to be taken together, and the whole transaction as one; but when we do so, what have we? This woman, anxious to have two bonds go to the Niles children in equal shares, and the two others to the Haskins children in equal shares, puts them in the hands of a trusted counsellor for this purpose, under circumstances and with directions that make a perfect *donatio mortis causa* of each parcel. That is the substance of the transaction. She can recall the gifts at any time before she dies. If she does not, the property will go as she has said. Now her counsellor suggests that a will would make it safer, and so she consents to make a will giving the property to the same persons. She does not take back the bonds, nor think of it, apparently. Suppose the will had been valid; what has she done to disturb her previous work? The will is of no effect until her death, and until her death she has exactly the same power to recall her gifts as if she had not made the will. What inconsistency is there in the two acts under such circumstances? If the will had attempted to make a different disposition of the property, another question would have arisen. But even then it would have been a question of fact, rather than of law. The two transactions having occurred in this case under such circumstances as require them to be treated as one, a will giving the property to others would be strong, if not conclusive, evidence that she did not leave the property in Mr. Hebard's hands for the purpose first declared. If, however, the two things had been entirely separate, completed and distinct,—a good gift *mortis causa* followed some time later by a will, even a valid will, sending the property elsewhere,—the gift would prevail over the will if no other means were taken to revoke the gift. So are the cases, and such is the reason of the thing, for the will speaks only from the death of the testator, and *at* death the power to recall the gift is gone. *Wade* v. *Button,* 72 Vt. 136, 47 Atl. 406; *Em-*

*ery* v. *Clough,* 63 N. H. 552, 4 Atl. 796, 56 Am. R. 543; *Brunson* v. *Henry,* 140 Ind. 455, 39 N. E. 256; 14 Am. & Eng. Enc. (2d Ed.) pp. 1065 and 1066, with citations. In the present case, if the will had been well executed, its only effect would have been to make assurance doubly sure; and the fact that it was not well executed ought not, in right, and cannot, we think, in law, bring to naught the previous steps, which were themselves quite sufficient to carry the owner's purpose into effect.

In this view the other questions discussed are of no importance.

*The decree of the Court of Chancery is affirmed and the cause remanded; the rule as to costs to be the same here as in that court, the parties having so agreed.*